later today, namely, Mastelsky v. Merit System Protection Board, that's appeal number 2008-3046. On the argument calendar, we'll hear argument first in appeal 1311 from 2007, Power Dekor v. International Trade Commission. Mr. Rosencrantz? Your Honor, before the clock starts, may I just do a couple of housekeeping matters for the court to? What do you have in mind? Just to alert the court that one of the three appellants in the case has signed a license. The other two remain very much alive, but I didn't want the court to be blindsided by that. Very well. Just a question. The commission, I know, will take the position that this case is not new. I just wanted to know if the court wanted to hear it from the commission first or just hear the arguments in the normal course. We're going to hear the arguments in the normal course. Thank you, Your Honor. The floor is yours. May it please the court. As I said, the commission agrees with us that the case is not new. I figured I should start with the question that the court posed by fax yesterday. And the reason is that there is a real controversy here and now, not about whether there will be a GEO, but about the scope of the general exclusion order. As of now, there is in place a general exclusion order that applies to three sorts of products on three different categories of claims. And the question before this court is whether that is too broad, whether the GEO should be narrowed to apply only, as Judge Luckern found, to one category of claims. The answer to that question, Your Honors, is critical to my clients and to the flooring industry at large. Is the suggestion that some products would not infringe the claims which are not involved in this appeal, but would infringe the claims that are involved in the appeal? Yes, Your Honor, absolutely. And there is evidence in the record of exactly such floorboards. If the court looks at the claims chart on pages 120 to 121 of the appendix, you see specific examples of products that would not infringe the SNAP action claims, but would infringe the other two, according to the complaint in here. And on pages 6042 and 6052, you see clear pictures of such products. My clients would like to be able to produce products like that and import them, but as of now, there is in place an order directing customs officials that if they try to do that, they will for now and for all time, until this court lifts the scope of the general exclusion order as to those two, they will be blocked and there is no recourse for them without being able to appeal that scope. Now, I know the Commission may go into more detail. I'm happy to answer questions on mootness, but if not, I would turn to the merits. Merits. Thank you, Your Honor. I'd like to begin with point two, which is the new matter argument, because as the briefs have shaped up, I think it's the simpler of the two to address. And let me begin by pointing the court's attention to page 13 of our reply brief, where you see a figure. It's a figure that by now is probably familiar to the court. It shows four spaces labeled A through D, and everyone agrees that the relevant claims call for clearances at precise spots along the tongue and groove. So looking at that, for example, Claim 5 requires locations, excuse me, spaces at locations B and C without regard to whether there's a space at A or D. Claim 17 requires a space at location A and either B or C without regard to whether there is a space at both of them or at D. Was there any change in the spaces that are depicted in this figure when the specification was changed? No, Your Honor. The figures remain the same. The spaces are the same. The spaces are the same, except for the fact that some are labeled differently. And our basic point is simple, that the concept of clearances appears nowhere in the original specification. In order for this to be permissible, this amended specification, a person skilled in the art ought to be able to look at the original specification and immediately and clearly see which combinations of spaces are claimed and which ones are not. And there's no way that someone could look at this figure and all of the others and realize, oh, it's got to be A and B or C or B and C but not necessarily A. There's no way to do that. In fact, the manner in which the administrative law judge reached that conclusion is downright counterintuitive if you look only at the original specification. For example, the word clearance actually has two different meanings depending upon which claim it's used in. And so the notion that someone could have figured that out, defined the concept, without actually ever having seen the word clearance or had it defined and known what the clearances are and which ones count and which ones don't seems completely implausible, much less immediately clear. And I want to emphasize that this was a new inventive concept. The original specification, from the original specification, was clear that the purpose of these spaces was to allow floorboards to join without particles or dust getting in the way. The particles or dust would be moved to what are called dust chambers. The new inventive concept here is that after they're joined, these clearances in specific spots allow the floorboards to be joined optimally so that it's the optimum lock, which concept appears nowhere in the original specification. Unless there are questions on that, I'd like to turn to the infringement issues. And on infringement, all the parties agree on two basic points. The first is that the relevant claim language requires bending, and bending for two of them in particular spots along the lower lip. And the second is that Unilin's expert did not actually measure for bending. He measured only for lip displacement. And our point again is really quite simple. There is a difference between a lip moving down at the end and bending. And none of us would even be here if Unilin had done what you would expect a litigant to do in a patent infringement case, which is when their expert came back and said, Eureka, there is lip displacement, to send them back and say, Thank you very much, will you now go please and measure along the supposed curve to prove that there's bending rather than lip displacement. Was there evidence that such a test was available? Your Honor, there is evidence in the record that one of the experts did such a test with the same instrument that this particular expert Lefersky used. And in fact, the commission and Unilin both rely now on his test. So there is such a thing, although the commission and Unilin both argue that that test was not a useful test back before the commission. But what is this test that was designed to measure the bending? What did it show? Oh, it showed as to some products, but not all, of one particular respondent that some of those products bent. That respondent came in, that respondent did that test to prove the point, Look, our old products, sure they bent, but we now have a new product that doesn't bend. And so that was the purpose of introducing that. So yes, there is evidence that one can do that, and it seems intuitively clear in this world of miniature gadgetry that you want to be able to design a test with lasers or some such device that does measure things with great precision. The gap in the evidence is all the more important because that very same expert said that he observed in up to half of the samples that the sample actually cracked. So if you look, for example, at page 55 of the green brief, in Unilin's brief, you see an example of that where you're talking about lip displacement of only a fraction of a hair, and then you see a hairline crack there that could easily have been responsible for that lip displacement. It underscores all the more that Unilin should have produced an expert that was capable of measuring the bending. Now, Dr. Lepersky, Unilin's expert, did testify that even where fracturing occurs, it still behaves like a cantilever, but all he's doing there is layering a theory that has no factual basis on top of a theory. And this court has been clear in cases like Novartis that you can't just posit a theory to prove infringement. You have to demonstrate that the theory actually plays out in real life, which is exactly what Unilin failed to do in this case. One of the things they refer to is this snap action test, and they say that Dr. Lepersky observed bending when the boards are jammed together and one is displaced. But if you look at the testimony there, Dr. Lepersky quite clearly never said he observed bending. He always says the same thing. I saw the lip go down, displacement, and I saw it go back up. That's not the same as bending. I guess you could have had your expert do a bending test if you'd wanted, right? We could have, Your Honor, except that our experts came in and said that there was no displacement. They didn't do the bending test that you say that the commission should have done. Right, but they detected nothing. They detected a straight line, so they couldn't do a bending test on a straight line. They said there was nothing to measure. But they didn't reach that conclusion through the test that you say the commission should have used. Right, and the reason is they didn't need to because if the lip doesn't move at all, obviously there's no bending. And, of course, the burden is on Unilin to produce the evidence, not on us to produce the evidence to the contrary. Do you want to save the rest of your rebuttal time? Yes, thank you, Your Honor. Mr. Wirth. On the luteness question, the commission does believe that there is a lot of controversy. I'd like to clarify the citations of the appellants. A6042 and A6052 and actually A120-121 are discussing products of other administrative respondents. So those are products of people who are not appealing at this time. And the appellants can correct me on that. So the issue as the commission sees it is whether these particular appellants would in future produce a product they have not yet produced. And the commission understands the general exclusion order, which this is a general exclusion order, would cover a general scope. And so anything that would infringe Claims 1, 2, 3, and 4 would still be covered. You're saying it's a design-around issue. It's pertinent because in the future they might design around the patents that aren't involved in the appeal, but they couldn't do it if they confronted the patents that are involved in the appeal. Yes, Your Honor. I guess the way Congress designed the statute would be to, in the case of D2B, cover parties that might not be identifiable. So here there were 32 respondents, and the commission in its different opinions has discussed that a foreign producer could change a model number and then try to import it and say, well, this is a new model number, so it's not covered by the scope of the claims, but the Customs Service would still have the discretion to determine whether this new model number would still be covered by the scope of Claims 1, 2, 3, and 4. And just for case law, in case the Court wants some relevant case law about this, there's the Texas Insurance v. ITC case, 871 F. 2nd, 1054 at, let's say, 1068, and the Intel Corps v. U.S. International Trade Commission, which is 946 F. 2nd, 821 at 844. We believe those are distinguishable based upon the scope of the order. Those were limited exclusion orders. And as a housekeeping measure, I'll note there's also a temporal issue where the 779 patent has a patent term adjustment. So even though they're all continuations, that patent would have a longer life, and therefore the exclusion order under that theory would have a longer life of 108 days. Turning to the merits, on infringement, there is substantial evidence from the totality of the evidence. The Commission found that this floor panel has the elastically bendable limitations recited because it meets the definition of a cantilever beam, fixed at one end, free at the other. So by the laws of mechanics, it would behave in this bending fashion. A155, the ALJ describes that these things are hard to pull apart, and there's transcript sites there about even if there's a fracture, there's still this integrity and elastic functioning of the joint when it's hard to pull the joint apart, and that is probative of the elastic return of the lower lip that holds the joint in place. And as the appellant discussed, there's a graph, a green brief, page 33, and that was with regard to a respondent. It's not here on appeal, but it's probative that joints made of actual panels, made of MDF, HDF, behave in this manner. On the validity issues... Well, what do you understand the argument of the other side to be? That as a matter of law, the test couldn't prove the fact that it was taken to have proven? Are you asking me whether this is an issue of law rather than an issue of fact? That's the way you could put it. So my first answer is that the infringement is a factual issue, and the commission itself is reviewed for substantial evidence, sort of the way a jury would be. There could be legal issues embedded in that. So, for example, there was a Daubert finding by the ALJ that Dr. Lefersky was a credible expert. No, what I'm asking you is what you think his argument is. I think that his argument is that it is a matter of law, that it is insufficient evidence as a matter of law. So it would turn the factual issue into a legal issue, and I think one way to do it would be to say, and I would be the first to concede that there is some use of indirect evidence that the Kahn-Lieber beam itself is basically a way of understanding that this does bend, to meet the Olesky-Bendel limitations. Is this a hidden Daubert issue? Is he really arguing that the theory and test and combination thereof by the other side can't prove the point that was offered to prove with bad science, bad engineering, bad material measurement, so that the evidence should have never been admitted in the first place or, having been admitted, should be held after the verdict, so to speak, to be deficient as a matter of law, and therefore the result has to be changed. I think Daubert is one legal issue that's embedded, and if I were to make an argument on their behalf— Well, was there a Daubert ruling in this case? There was a discussion of Daubert in the commission opinion with respect to whether the Michio Toyo gauge was a viable method of measuring the displacement of the lower— He doesn't complain about the gauge, as I understand it. He complains about where along the linear extent of the piece that the gauge is operating. He wants the gauge operated up toward the fixed end, and he seems to be arguing that if the gauge only measures the displacement down at the free end, the lip end, that as a matter of proper engineering, that doesn't tell you anything about bending. Assuming that they're attacking the use of a cantilever beam analysis, not only is there what we would characterize as a Daubert sufficiency of the expert to testify about it, they're making a factual argument that the fracture disproves the analysis that there's elastic bending. But they're also saying that there's a better way of doing this as a matter of science, and that the commission, instead of using an indirect approach to this, should have actually measured the bending. Are they correct that there's another way of doing it that is more direct? I believe that is correct, that the complainants before the commission could have had their expert, instead of just measuring the distal end, measure every point along, which is, I understand what Dr. Lang did for this one-yekalon product. I would say that there is teaching from this court that indirect evidence is usable. The Supreme Court has said that it can be more satisfying than direct evidence, and this court has cited that. The issue isn't so much direct versus indirect. The issue seems to be whether, if there's a better test, it has to be used, and the less good test has to be viewed as so deficient as to not be capable of proving the point. So even if there's a better test, to my way of thinking, that doesn't resolve the question of whether the less optimal test is still good enough. I think it's an important concern as to whether a complainant would be required to use the best possible test. I would understand this as whether there's substantial evidence that a reasonable mind could draw a conclusion that it's not necessary to take an MRI if an X-ray would do the trick. If there are other questions, I'm happy to entertain them. Otherwise, I'm into the intervener's time. I'm just handing you notes about that. Well, let's hear from Mr. DiMatteo directly from the horse's mouth instead of by notes. It's a fact question. It's not a legal question, Your Honor, addressing that first. Indeed, and that is why you can approach it. Well, I want to ask you the same question I asked Mr. Wirth. What do you think their position is as between a fatal legal error and a misfinding of the facts based on proper evidence by the commission? Their position is a misfinding of facts that no reasonable mind can conclude upon the record before us that there's infringement at the lip bend. They don't challenge as a matter of law the testing protocol itself. In fact, if you turn to their blue brief at page 45, they say they're not presenting that issue on this appeal. They're not challenging that this is not a hidden doubt repulsion. This is a substantial evidence case. Well, I think what they're saying on 45, if I remember correctly, is that they're not saying that this isn't a good test to measure the displacement at the place where it was measured, which is not quite the same thing as agreeing that this is the right test to measure displacement. They're saying there's a better way of measuring bending than this test. Well, their entire case from down below, I agree with you on that subtle difference between it, but the end is the same. It's a fact conclusion that they're challenging. Well, suppose there is a better way. There may be thousands of better ways, but the question is, was the way it was done in this case sufficient evidence for a reasonable mind to conclude the lip bend? And the answer to that question is yes, for many reasons. One, they don't deny the cantilever beam theory. This is a basic law of physics. They don't deny that many of the products didn't have any cracks at all and bent and displaced. Therefore, there must be bending. They posit this crack theory, but they don't deny that a small crack can act like a beam as well. They only throw out a theory that, well, perhaps there could be any cracks, maybe even invisible, that run the whole length of the panel, to therefore no longer have a fixed end such that there's a hinge, their broken jaw theory. But there is zero evidence of that. Instead, all the evidence of record is to the contrary. That is, there's either no crack at all in a simple bend, visible in the micrographs and videotapes, and measured by displacement, as well as evidence that where there is subtle cracks, it still functions as a cantilever beam. When you say subtle cracks, what was the proportion of the cracked portion of the piece versus the uncracked portion? It depends on which dimension, but on the long side or short side, there may be 10, 20 millimeters or longer. I don't have one in front, but the average width of a floorboard is approximately the width of this book. The crack is maybe not even the size of that crease. You can see that in photomicrographs that we submitted and cited to us. So your argument then is that a crack that only goes that small portion of the distance couldn't possibly defeat the normal operation of the cantilever phenomenon. Exactly, Your Honor. As long as it's fixed, the laws of physics still apply. A small fracture, all that does is make the cantilever a little longer, but it doesn't deny it functioning as a cantilever. In fact, the testimony to that is fairly clear from Dr. Lepersky and others. Just to be sure, I understand you. You would agree with him that if we were able to correctly characterize it as a broken jaw, rather than a bending piece with some superficial cracks in portions of the surface, that it wouldn't operate as a cantilever. But the break would have to be, I assume, most of the way, if not almost all the way, through the depth of the piece. Exactly, Your Honor. As long as it can support and snap back up and still functions as a joint and holds it together, it's a fixed point. It's a cantilever. It bends. There's infringement. That's the condition of fact. It's very simple. Turning briefly on the jurisdiction question, there is no jurisdiction. I'm almost embarrassed for not making it clearer in our brief. We raised the issue tangentially. But there is no jurisdiction. Why? There's not any product on appeal that escapes the non-appeal claims. They concede that. So there's no product. I must have misunderstood opposing counsel. I thought he was claiming there were products that weren't covered by the three uncontested claims of the 836 patent. Let me finish. As to the companies they represent, all of their products will infringe the snap claims. Nothing that this Court can rule on will reverse the exclusion order for all of their products that they have made to date and that we're aware of. Their theory for jurisdiction is premised on the idea, well, perhaps in the future, we may want to make a product in the Site 2, the Yekalon product, at 0652. That product was not excluded in the general exclusion order. It didn't infringe for a completely different reason. The ALJ found it didn't have a tongue and a groove. It's a vertical lock. And the citation for that is at 8139. Is there a more basic point that we don't need to speculate about the future, what somebody might do in the future, when we're trying to decide whether the actual facts create a live controversy? Exactly, Ron. There is no live controversy here. There might be a future controversy, but there's no controversy today. Exactly. And if they wanted to come with such a product, they can seek a modification of the order, have it granted or denied, but with the product in hand, then they can come before you with a real dispute. But they're being enjoined. The exclusion order requires the exclusion of products that infringe the patents that are before us on this appeal. So the scope of the order covers infringement of these patents, and they're saying it prevents us from designing around in the future. And if I understand correctly, there's an issue about the expiration date of the patents as well. So I take it you don't want us to have these patents that are on appeal stripped out of the exclusion order. You would like to have them in the exclusion order. So there's a controversy about whether these patents should be covered by the exclusion order or not. The question needs a product. Let's take the biasing claims. Until they come with a product that doesn't have, doesn't bend like a lower limb. What's their remedy? Do you go back to the administrative law judge? If they were to make a product and get a ruling as to that product? Exactly. There has to be a controversy. But where do they have to start is what I'm trying to identify. They're trying to start here. And you seem to be implying no, that's not how you have to do it. You have to start somewhere else. So I'm just guessing maybe back in front of the AJ on a rule 60 type motion to amend the scope of the exclusion order. Right. And there is a procedure to do that at the commission. We would all love to come to this court and ask for permission for future products and ask your opinion and your advice. We're not asking our opinion about future products. They're saying take these patents out of the exclusion order. Because we didn't infringe these patents or some of them are invalid. And you want to keep them in the exclusion order. So there's a controversy to that extent, right? Well, the products that still infringe, that's the problem. We're looking at the order, not the patents. Is my statement correct? They want them out of the exclusion order. You want them in the exclusion order, right? Yes. Certainly, Your Honor. Certainly, Your Honor. Is there any case that says that their remedy has to be to go back and seek a modification of the exclusion order? Well, there is. Over the night we've been looking at this, there are cases which say, one, this court will not give advisory opinions for ITC theoretical designs. And it doesn't have review on that. No, but is there a case like this? At the moment, I have not found one. The closest we came is actually, I'll defer to the ITC counsel, he found the Intel case, which was shown to me a moment ago. And I will not cite that until I've had a chance to plan. How is it that you and Mr. Wirth disagree so fundamentally on whether we have a live controversy that's properly decidable by this panel on this record? I would have thought you would have the same position for the same reason. You seem to have opposite positions for reasons that are unclear, at least to me. Yeah, that's a question I think best posited to Mr. Wirth, because I think it's been a change of position that the Commission's had very recently. I'm not at liberty to speak with the Commission, but they've decided to tack one way this morning, where we felt we were on the same tack yesterday. So that's a Commission question. But still, there are no products that are before this court for which there exist that don't snap. A theoretical product that either has no clearances or doesn't snap. Yeah, but you agree that the order has an impact on future products, don't you? It certainly does, Your Honor. Well, and that's why you want to keep it in force, right? Exactly. So? Exactly. Aren't they entitled to litigate the question as to whether the order stays in place? Yes. With respect to the patents that are on appeal here? They are. Once they have a product that meets that theoretical definition. Until such time, they can't get the advice of this court. I'm over my time. Thank you. All right. Mr. Rosenkranz, you have four minutes. Thank you, Your Honor. Let me just begin very briefly with the jurisdiction question where counsel ended. First, I would ask the court if it has any doubts about jurisdiction to allow us to brief the issue. Unilin knew about it. On page 36 of their brief, they pointed out that no matter what, the GEO will continue. And they didn't raise this issue as a matter of jurisdiction. Secondly, a GEO is not product-specific. It is not like your usual patent infringement case where a product is presented to the court and the question is, does this product infringe or not? It is claim-specific. And I would urge the court to look at the GEO itself and see what it says. It instructs customs officials to look at products that come across their desk and answer the question, does this product infringe this claim? Thirdly, I believe— It is true that there are no existing products of your clients on this appeal that infringe the patents that are involved in the appeal that don't infringe the patents that aren't involved in the appeal. It is true, Your Honor, that before the commission, none of my clients' products were found to have infringed one set of claims and not the others. But that does not mean that there do not exist such products, nor that my client doesn't have a roadmap for exactly how you would go about developing those products. And it's a very critical point. I think the court, if it looks further or allows briefing, will learn that you cannot go back and challenge the validity of a GEO after it's already been affirmed on appeal. You can argue, wait a minute, this product does not fall within the scope of the GEO. But you can't—there is no 60B motion to challenge the validity. Let me turn then to— The validity of what? For example, to challenge the validity of the patent on the new matter argument or to challenge the validity of the legal ruling made in the first instance on infringement. And I should also mention— Why not? These patents were litigated in front of the administrative law judge and further decisions by the commission. Why couldn't their validity have been challenged on any and all grounds at that time? No, no, no, Your Honor. They could have, and they were. Okay. I'm saying prospectively, we cannot go back and say, hold on a minute. We've got a product that we believe should be excluded from the scope of the general exclusion order on a basis that we've already argued to the commission in laws. That might not be the case if we dismiss the appeal as moot. If we dismiss the appeal as moot, then presumably in the future you could go in. Well, no. If you dismiss the appeal as moot, the order stands. And I'm just saying that there is no mechanism— But it's not been adjudicated by us. It stands as a commission order. It stands as an order that the effect of which is as if there was no appeal, and then the challenges that are available to future orders, orders in the future, are whatever they are, but they do not include an ability to go back to the commission. Let me just make a brief point on infringement. Well, what does happen? If you made a new product which you think wouldn't infringe, but customs reads it as infringing, and it's one of the patents enumerated in the order, then what happens? Well, so if we make a new product and we— Let's say, let's go to validity because that's an easier example than I'll go to infringement. We have a new product. We argue, wait a minute, this new product shouldn't be held to violate the old GEO because the patent is invalid for new matter. The ITC says no. You already litigated that at loss. The Court of Appeals didn't reverse that. That's the end of the discussion. If we have a new— Well, what's wrong with that? Why should you get to litigate new matter related invalidity twice? Why isn't one good enough? We shouldn't, and that's exactly why— So then, with respect to the new product that you feel is non-infringing, you would not be focusing on validity. You'd be focusing on non-infringement. But if we wanted to focus on validity, Your Honor, this Court will never have affirmed the commission judgment on validity, which Judge Lockhearn found on a claim that Judge Lockhearn found to be invalid. So we have a standing ITC order that precludes us from challenging validity, and this Court has never adjudged the legitimacy of that finding of validity. And for infringement, if we have an argument that this new product doesn't infringe for reasons that are totally different from the arguments that we made to the ITC, sure, we can say, no, the border agent got it wrong, the customs agent got it wrong. But we cannot go back to the commission and say, wait a minute, remember that fact-finding that you found, that we tried to appeal and then couldn't because the appeal was found to be moot? We can't go back and say to them, we want to re-raise that issue that we already lost, that the Court of Appeals never ruled on. It's just not an option. Well, wait a minute. If you lose in round two of the commission, then you're going to appeal. When you come back here, why can't you raise the validity issue that we didn't address in the first appeal? Because before the commission, we can't collaterally attack a ruling that was already made. We have only one recourse, which is direct appeal. Well, why wouldn't the earlier ruling merge into the later ruling? It's certainly not going to be law of the case because we would not have decided the validity issue in the first appeal. And if I'm right that it would merge, then it would be right for our adjudication in the second appeal. And hence, you would not be blocked from getting an appellate review on the validity determination. Your Honor, I understand the point, which to me only underscores how complicated these issues are and how important it is for us to have an opportunity to brief them and actually argue them. I guess we could solve the problem by vacating the commission position on the grounds of the appeal. That was what I was just going to say, Your Honor. You can vacate the order. The question before this Court is not whether we have an opportunity to bring in future products. It's whether the order as it now exists should be allowed to stand. We're not talking about a hypothetical. You'd be happy if we vacated the order. Yes, Your Honor. I'd be thrilled. I was going to say something more about infringement, but I see my time has passed. So I leave it to the Court to tell me whatever it wants to hear about infringement. All right. Thank you. Thank you, Your Honor.